IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |
|---|---|
| SHERYL A. MARTINEZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 10-0354-CV-J-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**<u>ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION</u>**

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her disability application. The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff is a 57-year-old female with a work history as an office manager, a mental retardation aide, a dance instructor, and a business class instructor. On November 5, 2002, Plaintiff reported to her clinician that she was experiencing anxiety, tiredness, low self-esteem, decreased motivation, chronic pain, and sadness. Plaintiff explained that beginning in April 2002, she underwent colon resection surgery and developed a major infection, got divorced, and lost her home. Plaintiff also disclosed she had been sexually abused by her father, raped at age 15 by her boyfriend, and raped at age 18 by her employer. Her clinician diagnosed her with major depression, recurrent, moderate and assigned her a GAF score of 60.[1]

Plaintiff was seen by Mark Cannon, M.D., for an initial psychiatric evaluation on December 5, 2002. Plaintiff reported that her prescriptions for Celexa (an

---

[1] A GAF score in the 51-60 range represents moderate symptoms. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text rev. 2000).

antidepressant) and DextroStat (a stimulant) had been "extremely effective." Dr. Cannon wrote Plaintiff was doing "reasonably well" and also wrote Plaintiff was "stable on her current medications." Dr. Cannon assigned Plaintiff a GAF score of 60.

Dr. Cannon's progress notes from March 2004 to November 2005 show Plaintiff's diagnosis of major depression continued, but her prescriptions were effective. In March 2004, Plaintiff was diagnosed with attention deficit disorder in addition to depression. Plaintiff was still taking DextroStat. Dr. Cannon wrote "[p]sychotropic medications working well." In July 2004, Plaintiff reported the DextroStat was helping with her attention and concentration, but reported increased loss of interest and withdrawal. Dr. Cannon prescribed Wellbutrin (an antidepressant), which was later discontinued.

Between October 2004 and February 2005, Plaintiff switched between DextroStat and Ritalin (a stimulant), eventually returning to DextroStat as the most effective medication. Dr. Cannon wrote in November 2004 Plaintiff had "much improved concentration, focus and attention." He added a prescription for Cymbalta (an antidepressant) when Plaintiff reported dysphoria, withdrawal, and loss of interest in February 2005. Plaintiff experienced nausea with Cymbalta but was "[o]therwise doing generally well" in March 2005 and had a "[b]right affect."

Plaintiff reported in April 2005 that her depression had been "essentially situational" and stated she "[felt] better as a result of some situations being resolved." Plaintiff reported her Cymbalta was no longer helpful and Dr. Cannon discontinued it. Plaintiff also reported that she had tried a friend's prescription of Adderall (a stimulant) and found it very effective. After discouraging Plaintiff from using others' prescriptions, Dr. Cannon prescribed her Adderall. When Plaintiff reported the next month that she was experiencing some loss of interest and dysphoria, Dr. Cannon added Tofranil (an antidepressant).

On June 2, 2005, Plaintiff was "doing well" on her medications and had a "[b]righter affect." Although she reported mood changes with agitation and depressive symptoms by the end of June 2005, she did not take the medication Dr. Cannon prescribed her, and on July 21, 2005, Dr. Cannon wrote Plaintiff was "[d]oing well on the Adderall, have no complaints." On August 31, 2005, Plaintiff reported to Dr. Cannon

2

that "being on the stimulant alone has been effective and has helped not only with attention concentration but also with anxiety and her mood disorder." Plaintiff reported "[n]o problems with appetite, sleep, headache or stomach discomfort."

The improvement noted by Dr. Cannon stands in stark contrast to the psychological assessment performed in September 2005 by Robert G. Urie, Ph.D, who evaluated Plaintiff in connection with her state Medicaid application. Dr. Urie wrote Plaintiff "presented herself as highly emotional, highly distractible, anxious, depressed, worried, tearful, and fretful. . . . She reports sleep and eating disruptions, concentration loss and racing thoughts, indecisiveness, hopelessness and panic attacks." Dr. Urie diagnosed Plaintiff with major depressive disorder and assigned her a GAF of 43.[2]

But when Plaintiff returned to Dr. Cannon on November 18, 2005, the extreme impairments Dr. Urie noted were not observed. Dr. Cannon wrote, "She is pleasant and cooperative and overall feels like the stimulant has greatly helped with attention, concentration and focus. Appetite is improved. Sleep is improved. . . . Well dressed and groomed."

J. Scott Morrison, M.D., a medical consultant, completed a functional capacity assessment and a psychiatric review technique form on January 17, 2006. Dr. Morrison concluded Plaintiff was moderately restricted in her activities of daily living, faced moderate difficulties in maintaining social functioning, and faced moderate difficulties in maintaining concentration, persistence, and pace. Dr. Morrison concluded Plaintiff could function in a low-stress work setting.

Plaintiff returned to Dr. Cannon in January 2006 and indicated her recently-added prescription for Effexor (an antidepressant) was effective. Dr. Cannon noted Plaintiff had a bright affect and generally seemed to be doing well, with the Adderall continuing to help with her concentration, attention, and focus. In contrast, Curtis D. Gobes, LPC, MA, assessed Plaintiff with a GAF of 42 in her initial assessment with him in February 2006. When she returned to Dr. Cannon on March 7, 2006, Plaintiff

---

[2] A GAF score in the 41-50 range reflects serious symptoms. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text rev. 2000)

reported "some residual problems with attention and concentration," but her medications were not changed.

Plaintiff saw Dr. Cannon again on March 28, 2006, reporting the return of some symptoms. Dr. Cannon discussed how recent stressors may be affecting her mood. Dr. Cannon increased her Effexor and prescribed a sleep aid, but did not otherwise change her medications. At her follow-up visit on April 25, 2006, Dr. Cannon wrote Plaintiff was "doing well with the adjustment in the Effexor" and was "[m]aintaining a good level of activities of daily living." Dr. Cannon also wrote Plaintiff "[c]ontinues to have improved concentration, focus and attention" and added Plaintiff was "[t]olerating medications well."

Grant Piepergerdes, M.D., completed a psychiatric transfer note on July 21, 2006, reciting that Plaintiff was transferring to him from Dr. Cannon, who had left the agency. Plaintiff reported to Dr. Piepergerdes that she had stopped taking the Effexor because she was attending psychotherapy, and Dr. Piepergerdes wrote she was "doing fairly well on the medicines." Despite what appears to be a positive evaluation, Dr. Piepergerdes assigned Plaintiff a GAF score of 50.

Therapist Gobes completed a "Summary of Services" for Plaintiff dated November 15, 2006. Gobes wrote Plaintiff "shows persistent worry and hypervigilance, suppressed anger, guilt, and low self-esteem." Gobes noted Plaintiff stopped work and pleasurable activities in part because of social discomfort, and wrote Plaintiff exhibited "depressed affect, lack of energy, indecisiveness, social withdrawal, and feelings of worthlessness." But Gobes also noted therapy was helping Plaintiff, stating, "Sheryl has gained a good deal of insight. She has acknowledged a greater capacity for resilience, higher regard for self and life, greater control over thoughts and emotions, and an increase in coping abilities."

Dr. Piepergerdes saw Plaintiff on May 17, 2007. Plaintiff reported Adderall continued to work well for her. Although Plaintiff thought she might need something to stabilize her mood, she also reported her adult son had been significantly upsetting her and she hoped he would move out. Dr. Piepergerdes added a prescription of Lamictal (used to treat bipolar I disorder), but Plaintiff quit taking this within a month and

4

indicated she did not want to take any more mood stabilizers.

Dr. Piepergerdes again recommended a mood stabilizer in October 2007, when Plaintiff reported she was doing "fairly well" and that "[g]etting away from her ex has helped significantly with anger, mood swings, and anxiety." Plaintiff refused the medication. She returned in January 2008 and reported she was "doing okay" with her medication. Dr. Piepergerdes noted Plaintiff was "frustrated" because she was "financially dependent on her husband . . . [who] . . . is emotionally and occasionally physically abusive," but noted no other problems. Dr. Pierpergerdes again recommended a mood stabilizer, but Plaintiff was not prescribed one.

The ALJ held a hearing on April 7, 2008. Plaintiff testified and reported "[e]xtreme mood swings, panic and anxiety . . . [and] . . . social anxiety." She testified her sleep patterns were "very inconsistent," explaining she typically would "be up for two days, sleep for three." She also testified she experienced hopelessness and lack of interest and felt "like a basket case."

The ALJ denied Plaintiff disability benefits, finding Plaintiff retained the residual functional capacity to do light work with some mild restrictions. In determining Plaintiff's residual functional capacity, the ALJ concluded Plaintiff's symptoms were effectively controlled by treatment and medication. The ALJ noted Plaintiff did not submit any evidence of persistent signs and findings supporting her claim of mental disability; the ALJ also noted Plaintiff's sporadic work history prior to her alleged onset date showed poor motivation to work. Based on hearing testimony from a vocational expert, the ALJ concluded there was a significant number of jobs in the national economy Plaintiff could perform, precluding a finding of disability.

## II. DISCUSSION

"[R]eview of [the Commissioner's] decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some

5

evidence may support the opposite conclusion." *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. *Forsythe v. Sullivan*, 926 F.2d 774, 775 (8th Cir. 1991). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Smith v. Schweiker*, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Plaintiff's sole argument is the ALJ failed to consider particular items of medical evidence. The ALJ must consider the medical opinions in a claimant's case and may reject those opinions that are inconsistent with the record as a whole. *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). The evidence Plaintiff complains was ignored by the ALJ are Dr. Urie's GAF score of 43 in September 2005, when he examined her for state medical assistance; Therapist Gobes' GAF score of 42 in February 2006 during his initial assessment of her; Dr. Piepergerdes' GAF score of 50 in July 2006 after she transferred from Dr. Cannon; and Dr. Morrison's assessment as a medical consultant that Plaintiff was moderately restricted in her activities of daily living, faced moderate difficulties in maintaining social functioning, and faced moderate difficulties in maintaining concentration, persistence, and pace.

Plaintiff's only proof the ALJ failed to consider this evidence is the ALJ's failure to discuss this evidence in her opinion. But "an ALJ is not required to discuss every piece of evidence submitted," and "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citations and internal quotations omitted).

The ALJ may well have considered Plaintiff's evidence but chose not to discuss it. *See Weber v. Apfel*, 164 F.3d 431, 432 (8th Cir. 1999). And the ALJ would have been warranted in discrediting it. *See id.* The low GAF scores reflecting severe symptoms were inconsistent with and unsupported by Plaintiff's treatment records, which routinely showed Plaintiff was doing well on her medications, particularly with Adderall. *Cf. Halverson v. Astrue*, 600 F.3d 922, 930-31 (8th Cir. 2010) (affirming ALJ's decision to not rely on GAF score of 40 where history of GAF scores showed only

moderate symptoms).

      While Dr. Morrison's findings of moderate functional limitations were more consistent with the evidence as a whole than the low GAF scores, this does not mean the ALJ's determination Plaintiff suffered only *mild* functional restrictions lacked substantial evidence. Plaintiff's symptoms waxed and waned between appointments, but for the most part she was attentive and responsive to her treatment. *See Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir. 1998) (concluding disability precluded where medication controlled symptoms). And Plaintiff refused to take the mood stabilizers Dr. Piepergerdes recommended. *Cf. Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir. 1994) ("A lack of strong pain medication is inconsistent with subjective complaints of disabling pain" (citation omitted)). Since there was conflicting evidence on the record, the ALJ's determination Plaintiff experienced only mild functional restrictions is entitled to deference. *See Halverson*, 600 F.3d at 931. And even if the ALJ should have adopted Dr. Morrison's moderate limitations, this would not require reversal; "a moderate limitation . . . does not prevent an individual from functioning 'satisfactorily.'" *Roberson v. Astrue*, 481 F.3d 1020, 1024 (8th Cir. 2007).

### III.  CONCLUSION

      The Commissioner's decision is affirmed.

IT IS SO ORDERED.

DATE: December 9, 2010

/s/ Ortrie D. Smith  
ORTRIE D. SMITH, JUDGE  
UNITED STATES DISTRICT COURT